### AFFIDAVIT IN SUPPORT OF APPLICATION FOR
### SEIZURE WARRANTS

I, Alex J. Zappe, being a duly sworn Special Agent with the Federal Bureau of Investigation, swear under the penalty of perjury, that the following statement is true and correct to the best of my knowledge and belief and is based on the following facts:

### PURPOSE OF THIS AFFIDAVIT

1.      This affidavit is submitted in support of seizure warrants for assets located in Mesa County, Colorado.  Based on my investigation, training, experience, and interactions with other law enforcement officers, there is probable cause to believe that Cory Newton THOMPSON has committed violations of Title 18, United States Code, Section § 1343, Wire Fraud; and Title 42, United States Code, Section § 408(a)(7)(B), Fraudulent Representation of a Social Security Number.

2.      I am requesting an order to seize the following assets:

  a.  One 2014 GMC 2500 Denali HD, crew cab, pickup truck, Vehicle Identification Number (VIN) 1GT120C81EF133872;

  b.  One 2015 GMC Sierra, crew cab, pickup truck, Vehicle Identification Number (VIN) 1GT120E8XFF666138;

  c.  One 2016 GMC Sierra, crew cab, pickup truck, Vehicle Identification Number (VIN) 1GT12UE82GF134388;

  d.  One 2013 Hyundai Sonata, 4-door sedan, Vehicle Identification Number (VIN) 5NPEB4AC1DH731609;

e. One 2005 Caravelle 232 Interceptor Ski Boat, Hull VCN18140E505

and one 2005 Tenn Boat Trailer, Vehicle Identification Number (VIN)

1TPSB262451053456;

a. Two 2001 Yamaha GPR800 Wave Runner Jet Skis, Hull

YAMA2203A101 and YAMA1162B101.

3.      The facts set forth in this affidavit are based on my direct participation in the

investigation, my personal observations, my training and experience, and information

obtained from other witnesses.  I also reviewed bank records for accounts belonging to

the following individuals and entities: Cory Thompson, Christine Thompson (Cory

Thompson's wife), Larry Thompson (Cory Thompson's father), Dylon Thompson (Cory

Thompson's son), Dack Energy Services LLC, and Dack Field Services.

4.      Based on the evidence developed, described and detailed herein, I submit that

there is probable cause to believe that: (a) THOMPSON committed violations of Title 18,

United States Code, Section § 1343, Wire Fraud; and Title 42, United States Code,

Section § 408(a)(7)(B); and (b) that proceeds obtained as a result of the criminal offenses

were used to purchase the items listed in paragraph 2 above.

5.      This affidavit is intended to show there is probable cause for the requested seizure

warrant and does not purport to set forth all of my knowledge of, or investigation into, this

matter. I have not included each and every fact known to me concerning this

investigation.  I have set forth only the facts that I believe are necessary and applicable

to establish the appropriate foundation of probable cause for the issuance of the

requested seizure warrants.  I have not purposely omitted any fact(s) that undermine or are contrary to the opinions and conclusions set forth herein.

### AGENT BACKGROUND

6.      I am a Special Agent with the Federal Bureau of Investigation ("FBI"), currently assigned to the Denver Division, Grand Junction Resident Agency.  As such, I am an investigative or law enforcement agent of the United States authorized under Title 18, United States Code, Section 3052, that is, an officer of the United States who is empowered by law to conduct investigations, to make arrests, and collect evidence for various violations of federal law.  I have been employed as a Special Agent of the FBI since February 2004.

7.      I have experience in conducting investigations involving financial fraud, public corruption, drug trafficking, violent crimes, gangs, fugitives, crimes aboard aircraft, cyber-related matters, and sensitive investigations involving International and Domestic Terrorism.

8.      Through my experience and training, I have become familiar with activities of individuals engaged in illegal activities, to include their techniques, methods, language, and terms, as well as techniques to conceal or disguise their actions in efforts to evade efforts by law enforcement agencies.

9.      Based on my personal knowledge and information furnished to me by other federal officers of the FBI and other law enforcement agencies, I am fully aware and allege the following facts to be true and correct.

## **PROBABLE CAUSE**

10.      The United States is investigating a complex, financial matter involving a scheme to defraud.  In October 2016, I began investigating the activities of Cory Newton THOMPSON, and others involved, with regard to a business partnership between THOMPSON and the victim of the scheme, identified herein by the initials "KB."  I affirm that KB is a real person, whose true identity is known to the FBI.

## BACKGROUND INFORMATION

11.      On January 14, 2013, THOMPSON incorporated a business known as DACK Energy Services, LLC ("DACK") with the Secretary of the State of Colorado.  Having known KB from youth sports events in the community over the years, THOMPSON approached KB to see if he was interested in helping to start DACK with financial support.  KB was known to THOMPSON and others as a wealthy and successful business owner.

12.      THOMPSON presented a written business plan and hoped KB would be the source of financial capital to help startup the business.  The potential earnings portrayed in the plan were attractive to KB, and KB considered the opportunity to be a lucrative business venture.

        a.      DACK was intended to be a roustabout service company.  That is, the company would service oil and gas well sites, including any

4

maintenance, repairs, and miscellaneous improvements.  These services

would be contracted by energy companies who own the well sites.

b.      In general, roustabout work is performed under a Master Service

Agreement (MSA) as well as a specified Purchase Order number that

authorizes the scope and quantity of the work to be done.  Contract

maintenance workers perform necessary jobs and record the work

performed on a handwritten Field Ticket.  The completed field tickets are

reviewed by energy company representatives, who verify the completed

work and sign the tickets.  An invoice is then created from the completed

and authorized field tickets and both the field tickets and the invoices are

sent to the energy company to be processed for payment.  I have learned

that the industry standard for payment on outstanding invoices can vary

between 30 to 90 days.

13.     On December 5, 2013, THOMPSON and KB entered into a business partnership

to run DACK.  KB, as the investor partner, provided the funding capital while

THOMPSON, as the operating partner, was responsible for the operational aspects of

the business.  THOMPSON's responsibilities included hiring employees, acquiring and

entering into contracts with oil and gas companies, managing work production,

procuring vehicles and necessary equipment, invoicing services rendered, and ensuring

payments were received.  KB set up the operating bank account for the company at

Home Loan State Bank and Timberline Bank, in Grand Junction, Colorado, provided a

part-time accountant, and provided the money to fund the business.

14.     At the beginning of the business, THOMPSON acquired a few small contracts in Wyoming which generated minor income.  He hired family members and friends as employees.  He reported to KB that he got a contract with two energy companies in Wyoming – Enterprise Production and Berry Petroleum.  With the new contracts, he claimed he needed to hire more employees.

15.     THOMPSON also told KB that he was pursuing large contracts in Texas that would be lucrative.  He discussed the large future jobs with KB and expressed the need to continue investing in new employees and equipment.  As part of his invoicing responsibilities, THOMPSON would also send copies of invoices to the DACK accountant so that they could be entered in the accounting records as income.  The invoices were added to the Accounts Receivable (A/R) account – representing work completed, invoiced, and awaiting payment.  As months passed, the amount of unpaid invoices in the A/R account started to grow substantially.

16.     In mid-2015, THOMPSON convinced KB that he had a potential contract in Texas that was worth at least half a million dollars and would require additional funding to get the contract and complete the work.  Believing the contract was a real possibility, and seeing it as an opportunity for the company to really take off, KB sought outside funding.  KB accepted two loans from friends, of $750,000 and $500,000 respectively.  KB backed these loans with his own personal guarantee in the event DACK was not able to cover them.  KB then acquired new office space and hired an office manager to assist in the administration of the business.  KB also hired a full-time accountant in anticipation that the business would require it.

17.     No contract in Texas ever came to fruition and the work promised did not happen as THOMPSON portrayed it.  The A/R amounts were still growing and the expenditures drained the newly-invested funds.  KB had invested approximately $1.48 million of his own money into the company with no return.  The A/R amount stood at approximately $1.49 million in uncollected revenues.

18.     KB, realizing DACK was not financially sustainable, took measures to end the business relationship. THOMPSON and KB agreed to end the partnership at the end of February 2016.  As part of the separation, THOMPSON agreed to purchase the company and pay back KB for his invested funds.  When THOMPSON failed to pay as promised, KB sought and received a Decree of Dissolution, which was issued by Mesa County District Judge Valerie Robison on June 23, 2016.  This decree granted KB the right to take control of the DACK entity and liquidate assets.  As a result of the civil proceedings and acquisition of documents and records, KB discovered that THOMPSON had defrauded him out of the invested money.  KB brought the matter to the FBI for further investigation.

<u>THE SCHEME</u>

19.     In 2016, I began investigating this matter. From this investigation, I learned that THOMPSON set up a few contracts with energy companies, and some legitimate work was performed by DACK in Wyoming and Texas.  I also discovered that the majority of THOMPSON's claims of work and contracts were false.

        a.      Through lawful means, I obtained business records from Enterprise Production, Berry Petroleum, West Texas Gas, and ConocoPhillips.

THOMPSON had submitted invoices to the DACK accountant claiming that work had been performed for each of these companies. The records and declarations from these companies, however, proved that DACK never had a contract with, nor performed any work for, any of them.

b.      In addition, I received records from Linn Energy, Merit Energy, Enerflex Energy, and Unit Corporation. These records confirmed that some of the work claimed by THOMPSON had been performed, invoiced, and paid to DACK. However, 173 invoices THOMPSON had submitted to KB and the DACK accountant related to these companies were fictitious; the claimed work was never completed and the amounts claimed were not owed to DACK.

c.      In total, from January 6, 2014 to January 15, 2016, THOMPSON created and submitted $1,492,009.50 in fictitious invoices to portray to KB that work was being performed and continued investment was needed. KB relied on these invoices in deciding to invest in DACK.

d.      THOMPSON submitted the majority of the fictitious invoices from his email account cory@dackenergy.com. This email account is serviced by Google. I learned from Google that the emails, with attached fake invoices, were transmitted through servers in several states throughout the United States, and eventually received by DACK employees in Colorado, thus affecting interstate commerce.

20.     During the course of this investigation, I also learned that THOMPSON opened numerous accounts at several banks to include personal accounts and business accounts. These business accounts were in the name of Dack Energy Services LLC and Dack Field Services, and these accounts were created and used without the knowledge of KB.

21.     The investigation also revealed that THOMPSON created two fictitious employees in order to steal funds from the company.

        a.      THOMPSON claimed that he hired two employees, Alejandro Bustos and Adam Martinez, to work for DACK.  In July 2014, THOMPSON submitted these names to the DACK accountant to add them to the payroll, along with dates of birth, social security account numbers, and addresses.

        b.      The social security account numbers used by THOMPSON for these "employees," however, belong to different people.  Agents interviewed the individuals that the Social Security Administration – Office of Inspector General verified the numbers were associated with.  Neither had any knowledge of THOMPSON, Alejandro Bustos, Adam Martinez, or DACK Energy Services, LLC.

        c.      Additionally, I investigated the addresses that THOMPSON provided for these fictitious employees.  By utilizing the Wyoming State Property Assessor database, I discovered that the addresses THOMPSON provided do not exist in Wyoming, and are likewise fictitious.

9

d.      Between July 24, 2014, and January 8, 2016, THOMPSON directed

DACK to pay $80,691.66 in wages to fictitious employee Adam Martinez

from numerous bank accounts.  During the same timeframe, THOMPSON

directed DACK to pay $83,323.71 in wages to fictitious employee

Alejandro Bustos from numerous bank accounts.

e.      Unlike other DACK employees, who received their wages via bank

direct deposit, THOMPSON directed the weekly paychecks for Martinez

and Bustos to be printed, physical checks.  THOMPSON himself picked

up the checks each Friday, stating he was going to hand deliver them to

the employees.  However, THOMPSON endorsed the checks, payable to

himself, and deposited them directly into an account he controlled at

Alpine Bank.

22.    As indicated above, the majority of the work THOMPSON claimed to be

conducting was entirely fictitious.  During DACK's operation, THOMPSON received

hourly and salaried payments based on this fictitious work.  The wages to THOMPSON,

combined with payments to the fictitious employees discussed above, represents

$433,430.56 in funds stolen from DACK company accounts.

23.    Throughout this investigation, I interviewed several former DACK employees,

which were largely friends and acquaintances of THOMPSON and his family.  From

these interviews, I learned that THOMPSON routinely employed individuals to work for

DACK, but rarely had them perform any legitimate work for DACK.  Instead, these

former employees reported that they were paid $1,200 per week and, if they worked at

all, THOMPSON asked them to perform personal services for THOMPSON and his immediate family, including landscaping tasks, maintenance on recreational vehicles purchased by THOMPSON, and babysitting THOMPSON's son.  Similarly, one employee reported that he was assigned to work in Texas for 8 months and was paid a salary for that entire period.  The employee estimated, however, that he and others he worked with only completed approximately 2 months of legitimate work during that 8 month period.  The remainder of the time, the workers were idle but collected a salary nonetheless.

24.     Finally, even after KB indicated that DACK could no longer continue to operate, THOMPSON continued to defraud KB out of revenues that were owed to DACK.

        a.      Without KB's knowledge, THOMPSON formed a similarly-named company—"Dack Field Services"—as a means to continue drawing on the few legitimate contracts he had established under the DACK name and business.  On March 3, 2016, THOMPSON opened two accounts with US Bank in Grand Junction, CO – one account in the name of Dack Energy Services and the other in the name of Dack Field Services.

        b.      THOMPSON collected deposits into both of these accounts from energy companies for legitimate work previously performed by DACK. THOMPSON did not notify KB of the continued revenue stream derived from DACK operations and failed to provide KB with any portion of the funds.

c.    In fact, THOMPSON drew down funds from these accounts to zero, and the bank closed the accounts. Thereafter, THOMPSON sought another bank to do business with.

d.    In furtherance of the scheme, Cory THOMPSON opened two accounts at Grand Junction Federal Credit Union. The first account was opened in the name of Dack Field Services on May 3, 2016, with account number ending in 8674. This account received $109,345.75 in fraudulent vendor payments. The second account was opened in the name of Christine L. Thompson account ending in 8625 on May 2, 2016, which received $36,500.00 in transfers from account 8674.

25.    On February 21, 2019, a federal grand jury indicted THOMPSON on 13 counts of wire fraud, and two counts of fraudulent representation of a social security number. I intend to execute the requested warrants contemporaneous with his arrest.

**BANK ACCOUNTS UTILIZED IN THE SCHEME**

**Home Loan State Bank #1601**

26.    On December 10, 2013, Home Loan State Bank account number ending-1601 was opened in the name of Dack Energy Services LLC. The signors on the account were KB and Cory THOMPSON. This bank account was solely used as an operating account for DACK.

**Home Loan State Bank #1602**

27.    On December 11, 2013, Home Loan State Bank account number ending-1602 was opened in the name of Dack Energy Services LLC. The signors on the account

were KB and Cory THOMPSON. This account was also associated with the operation of DACK.

### Timberline Bank Account #9385

28.    On April 16, 2015, Timberline Bank account number ending -9385 was opened in the name of Dack Energy Services LLC. The signors on the account were KB, Glen Whaley, and Cory THOMPSON. This account was used as an operating account for DACK

### US Bank Account #0517

29.    On March 3, 2016, US Bank account number ending -0517 was opened in the name of Dack Energy Services LLC. The signor on the account was Cory THOMPSON. This account received fraudulent vendor payments in the amount of $12,800.00 for the time period of March 3, 2016 through March 24, 2016.

### US Bank Account #0525

30.    On March 3, 2016, US Bank account number ending -0525 was opened in the name of Dack Field Services. The signor on the account was Cory THOMPSON. This account received fraudulent vendor payments in the amount of $36,187.00 for the time period of March 28, 2016 through May 17, 2016.

### Alpine Bank Account  #2156

31.    On March 12, 2007, Alpine Bank account number ending -2156 was opened in the name of Cory THOMPSON, Christine Thompson (spouse of Cory), and Larry Thompson (Cory's father). The signors on the account were Cory, Christine, and Larry Thompson. This account received fraudulent payroll deposits in the amount of

$174,908.41. These fraudulent payroll deposits consisted of payments from DACK payable to Cory THOMPSON for the time frame of January 1, 2014 through April 21, 2015. Alpine account #2156 was opened and utilized without KB's knowledge.

### Alpine Bank Account #9497

32.     On April 22, 2015, Alpine Bank account number ending -9497 was opened in the name of Cory THOMPSON and Christine Thompson. Signors on the account were Cory and Christine Thompson.  This account received approximately $104,006.78 in fraudulent deposits to include vendor payments in the amount of $9,500.00 and fraudulent payroll of $94,506.78 for the time frame of April 30, 2015 through January 8, 2016.

### Alpine Bank Account #3206

33.     On February 19, 2013, Alpine Bank account number ending -3206 was opened in the name of Dack Energy Services LLC. Signors on the account were Cory, Christine, and Larry Thompson. The account received approximately $363,720.94 in fraudulent deposits to include vendor payments of $ 109,327.62, deposits for the fictitious employees in the amount of $164,015.37, and reimbursement for fraudulent business expenses in the amount of $90,377.95. The time frame for the total fraudulent deposits is July 25, 2014 through January 8, 2016.

### Alpine Bank Account #5398

34.     On August 1, 2012, Alpine Bank account number ending -5398 was opened in the name of Dylon (son of Cory and Christine Thompson) and Christine Thompson. (On February 9, 2013 a revised signature card states that Christine Thompson was added.)

14

Signors on the account were Dylon and Christine Thompson. The account received

approximately $41,218.37 in fraudulent payroll deposits from May 1, 2015 through

December 18, 2015 from DACK.

### Grand Junction Federal Credit Union #8674

35.     On May 3, 2016, Grand Junction Federal Credit Union account number ending -

8674 was opened in the name of Dack Field Services. The original signor on the

account was Christine Thompson and Cory THOMPSON was added on August 5, 2016.

The account received approximately $109,345.75 in fraudulent vendor payments for the

time frame of August 1, 2016 through January 11, 2017.

### Grand Junction Federal Credit Union #8625

36.     On May 2, 2016 Grand Junction Federal Credit Union account number ending -

8625 was opened in the name of Christine L. Thompson. The signor on the account

was Christine L. Thompson. This account received $36,500.00 in transfers from Dack

Field Services Grand Junction Credit Union account #8674.

**PERSONAL BANKRUPTCY**

37.     On June 29, 2015, THOMPSON filed for Chapter 7 bankruptcy in the District of

Colorado, No. 16-16490-MER. THOMPSON filed individually after being sued civilly by

KB. As part of his petition, THOMPSON disclosed that he had "gifted" certain assets to

his son. These assets were purchased with proceeds from his fraud scheme as detailed

below. In addition, one asset was purchased from the bankruptcy estate by Thompson's

wife with proceeds derived from the fraudulent scheme.  On January 4, 2017,

THOMPSON received an Order of Discharge under 11 U.S.C. § 727.

## ACQUISITION OF ASSETS FROM ILLEGAL PROCEEDS

**2014 GMC 2500 Denali HD VIN 1GT120C81EF133872, License Plate GVX0261,**

**Texas**

38.     On February 13, 2014, Cory THOMPSON purchased the 2014 GMC 2500 Denali

for $55,368.71.  THOMPSON traded in a 2008 GMC Sierra 1500 and was given a credit

of $8,400.00 for the trade-in. Financial analysis reveals that the 2008 GMC Sierra that

was traded-in was paid for with at least $1,565.00 of proceeds from the fraud. When he

purchased the 2014 GMC 2500 Denali, THOMPSON also received a $6,250.00 rebate.

After the trade-in and the rebate, THOMPSON'S purchase price for the 2014 GMC 2500

Denali was $40,718.71.

39.     Between February 21, 2014 and January 11, 2017, Thompson paid

approximately $33,555.76 in payments to Wells Fargo DLR Services to pay off the

remaining balance on the 2014 GMC Denali.  The payments were issued from Alpine

account #2156, Alpine account #9497, and Grand Junction FCU account #8625. As

discussed above, each of those accounts contained proceeds from the fraudulent

scheme.

40.     Based on the financial analysis, there is probable cause to believe approximately

$35,120.76 in payments issued to Wells Fargo DLR Services to pay off the 2014 GMC

2500 Denali are proceeds from fraud and the vehicle is therefore subject to seizure

pursuant to 18 USC 981(a)(1)(C).

41.     The vehicle is registered to Cory Thompson.

**Two (2) 2001 Yamaha Gp800r HULL YAMA2203A101 and YAMA1162B101, permits CL7836FT and CL7837FT**

42.     On or about August 2014, Cory THOMPSON purchased two (2) Yamaha Wave Runner jet ski watercraft for $6,217.35 including finance charges.  Between August 29, 2014 and February 4, 2015 THOMPSON made payments totaling $7,364.12 from Alpine account #2156 to Warren Federal Credit Union to pay for the jet skis.

43.     Financial analysis reveals payments to the above listed account were comprised of fraudulent deposits from the underlying scheme.  Based on this information, there is probable cause to believe $7,364.12 in payments issued to Warren Federal Credit Union to pay for the jet skis are proceeds from fraud and the watercraft are therefore subject to seizure pursuant to 18 USC 981(a)(1)(C).

44.     In his Chapter 7 bankruptcy petition, THOMPSON stated that he gifted the jet skis to his son, Dylon Thompson, on September 1, 2015 as a birthday gift. The jet skis are currently registered to Dylon Thompson.

45.     I have personally observed these two watercraft at the business location of Thompson Landscape Maintenance, 2695 Unaweep Avenue, Grand Junction, Colorado. The jet skis are parked in the fenced storage yard of the business.

**2013 Hyundai Sonata VIN 5NPEB4AC1DH731609, License Plate 586GJQ, Colorado**

46.     On November 20, 2014, Christine Thompson purchased the 2013 Hyundai for $17,396.63.  Christine Thompson paid $1,500.00 as a down payment and financed the remainder through Security Service Federal Credit Union.  Between October 6, 2014 and March 31, 2015, approximately $3,032.00 was paid from Alpine Bank account

ending in -2156; between May 5, 2015 and June 14, 2016, approximately $6,220.00 was paid from Alpine account ending -9497; and between June 1, 2016 and November 8, 2016, approximately $1,950.00 was paid from GJFCU account ending -8625.

47.     Financial analysis revealed payments to the above listed accounts were comprised of fraudulent deposits from the underlying scheme.  Based on this information, there is probable cause to believe approximately $11,202.00 in payments issued to Security Service Federal Credit Union are proceeds from fraud and the vehicle is therefore subject to seizure pursuant to 18 USC 981(a)(1)(C).

48.     I have personally seen this vehicle parked at THOMPSON'S residence as recent as January 17, 2019. The vehicle is registered to Christine Thompson.

**2005 Caravelle 232 Interceptor HULL VCN18140E505 / Permit CL3927GH and trailer 2005 Tenn VIN 1TPSB262451053456, License Plate 813UIQ, Colorado**

49.     On March 31, 2015, Cory THOMPSON purchased a 2005 Caravelle 232 Interceptor ski boat HULL VCN18140E505 and trailer 2005 Tenn VIN 1TPSB262451053456 for $24,000.00.  THOMPSON financed approximately $19,294.00 from Warren Federal Credit Union ("WFCU").  Between June 11, 2015 and March 11, 2016, THOMPSON paid approximately $9,290.00 from Alpine Bank account ending -9497 to WFCU.  Between August 17, 2015 and January 7, 2016, THOMPSON paid approximately $3,590.00 from Alpine Bank account ending -3206 to WFCU.

50.     Financial analysis revealed payments made by THOMPSON from the Warren Federal Credit Union account were all comprised of fraudulent deposits from the underlying scheme.  Based on this information, there is probable cause to believe

approximately $12,880.00 are proceeds from fraud and the boat is therefore subject to seizure pursuant to 18 USC 981(a)(1)(C).

51.    On June 29, 2016, Cory THOMPSON declared Chapter 7 Bankruptcy and the boat was turned over to the Bankruptcy Trustee in Grand Junction, Colorado. From August 8, 2016 through January 11, 2017 Christine Thompson received $36,500.00 in transfers from the Grand Junction Dack Field Account ending in 8674. Subsequently, on June 14, 2017, Christine Thompson secured a loan for $12,500.00 from Grand Junction Credit Union for the repurchase of the boat from the Bankruptcy trustee. Christine Thompson made the subsequent loan payments from the Grand Junction Federal Credit Union account ending in -8625.

52.    I have personally seen this boat and trailer parked at Monument Storage, 615 S. Mesa Street, Fruita, Colorado. Furthermore, bank records obtained during the course of this investigation showed a monthly recurring expense of $75.00 paid from Thompson's accounts to Monument Storage. The trailer and boat are registered to Cory Thompson.

**2016 GMC Sierra VIN 1GT12UE82GF134388, License Plate GTS1814, Texas**

53.    On December 22, 2015, Cory Thompson purchased the 2016 GMC Sierra VIN X4388 for $51,838.00.  Thompson received a down payment allowance for trade-in, in the amount of $15,210.00 for a 2007 GMC Yukon.  Financial analysis revealed the Yukon loan from Ally Financial received approximately $3,411.66 from fraudulent funds from Alpine account ending -2156.  In addition, Thompson also made payment to Ally Financial for the 2016 GMC Sierra in the following amounts; $1,600.00 from Alpine account ending -9497; and $7,070.44 from GJFCU ending in -8625.

54.     Financial analysis revealed payments to the above listed accounts were comprised of fraudulent deposits from the underlying scheme.  Based on this information, there is probable cause to believe approximately $12,082.10  in payments issued to Ally Financial are proceeds from fraud and the vehicle is therefore subject to seizure pursuant to 18 USC 981(a)(1)(C).

55.     I have personally observed this vehicle at the Thompson residence on numerous occasions and as recently as February 20, 2019. Also on this date, I observed Christine Thompson operating the vehicle. The vehicle is currently registered to Cory and Christine Thompson.

**2015 GMC Sierra VIN 1GT120E8XFF666138, License plate GTS1815, Texas**

56.     On December 22, 2015, Dylon Thompson purchased the 2015 GMC Sierra Denali VIN 1GT120E8XFF666138 for $ 51,964.00.  Dylon received a down payment allowance for trade-in, in the amount of $16,392.00 for a 2014 Toyota Tacoma. On December 23, 2015, Dylon wrote check number 1001 from his Alpine Bank #5398 to Suntrup Buick in the amount of $9,500.00 as a down payment on the 2015 GMC Sierra.

57.     Financial analysis revealed that Dylon received fraudulent deposits from the underlying scheme from May 1, 2015 thru December 23, 2015 into his Alpine Bank #5398 in the approximate amount of $41,218.00.  Between February 1, 2016 and June 30, 2017, Dylon Thompson paid approximately $4,272.00 to Ally Financial from his Alpine Bank #5398. Financial analysis revealed the payments were comprised of fraudulent deposits from the underlying scheme.  Based on this information, there is probable cause to believe approximately $13,772.00 in payments for the 2015 GMC

Sierra are proceeds from the fraud and the vehicle is therefore subject to seizure pursuant to 18 USC 981(a)(1)(C).

58.     I have personally observed this vehicle at the Thompson residence on numerous occasions. I know the vehicle to be used regularly by both THOMPSON and his son Dylon. The vehicle is currently registered to Dylon.

## CONCLUSION

59.     Based on the facts set forth in this affidavit, there is probable cause to believe that THOMPSON has committed violations of Title 18, United States Code, Section 1343, Wire Fraud; and Title 42, United States Code, Section 408(a)(7)(B), False Representation of a Social Security Account Number.

60.     There is probable cause to believe that the assets requested to be seized are proceeds traceable to the violations of Title 18, United States Code, Section 1343, Wire Fraud, and are, therefore, subject to forfeiture pursuant to Title 18, United States Code, section 981(a)(1)(A) and (C), and subject to seizure pursuant to Title 18, United States Code section 981(b).

61.     Moreover, the Court has authority to issue seizure warrants for property located outside the District of Colorado, pursuant to Title 18, United States Code, Section 981(b)(3).  Section 981(b)(3) provides that a seizure warrant may be issued by a judicial officer in any district in which a forfeiture action may be filed under Title 28, United States Code, Section 1355(b), "and may be executed in any district in which the property is found, or transmitted to the central authority of any foreign state for service in accordance with any treaty or other international agreement."  18 U.S.C. § 981(b)(3).

In turn, Title 28, United States Code, section 1355(b) provides that a forfeiture action may be brought in any district where any of the underlying acts or omissions occurred upon which the forfeiture based.

62.     Further, 18 U.S.C. § 984 provides that the government need not identify the specific property involved in an offense that is the basis for the forfeiture if the property involved is funds deposited into a financial account when the forfeitable funds were placed into that account within the prior year.

63.     Accordingly, your affiant seeks seizure warrants for the following property:

       a.  One 2014 GMC 2500 Denali HD, crew cab, pickup truck, Vehicle Identification Number (VIN) 1GT120C81EF133872;

       b.  One 2015 GMC Sierra, crew cab, pickup truck, Vehicle Identification Number (VIN) 1GT120E8XFF666138;

       c.  One 2016 GMC Sierra, crew cab, pickup truck, Vehicle Identification Number (VIN) 1GT12UE82GF134388;

       d.  One 2013 Hyundai Sonata, 4-door sedan, Vehicle Identification Number (VIN) 5NPEB4AC1DH731609;

       e.  One 2005 Caravelle 232 Interceptor Ski Boat, Hull VCN18140E505 and one 2005 Tenn Boat Trailer, Vehicle Identification Number (VIN) 1TPSB262451053456;

       f.  Two 2001 Yamaha GPR800 Wave Runner Jet Skis, Hull YAMA2203A101 and YAMA1162B101.

I, Alex J. Zappe, being duly sworn according to law, hereby state that the facts stated in the foregoing affidavit are true and correct to the best of my knowledge, information, and belief.

Respectfully submitted,

_/s/ Alex J. Zappe_____
Alex J. Zappe
Special Agent, FBI

Reviewed and submitted by Assistant United States Attorneys Jeremy Chaffin and Elizabeth Young.

Submitted, attested to, and acknowledged by reliable electronic means on this _____28____ day of February 2019.

_____ _____
Gordon P. Gallagher
United States Magistrate Judge